IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

*Alexandria Division*

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | No. 1:26-mj-27 (PTG) |
| IVOR ANTHONY EVANS, | |
| Defendant. | |

**RESPONSE OF THE UNITED STATES TO
DEFENDANT'S SECOND MOTION FOR REVIEW OF DETENTION ORDER**

On January 30, 2026, a preliminary/detention hearing was held before Magistrate Judge Fitzpatrick (Dkt. 14).  The judge found probable cause for the charged offense and ordered Evans detained.  The judge determined that Evans had not rebutted the presumption under 18 U.S.C. § 3142(e)(3) favoring detention, and he further found that, if released, Evans posed both a danger to the community and a risk of nonappearance (Dkt. 23).  Evans again challenges that Order (Dkt. 31), having withdrawn his prior motion for review of the judge's decision (Dkt. 15, 24, 25).

In our response to Evans's first motion to revoke the detention order (Dkt. 22), we discussed the legal standards and caselaw applicable to the issues raised, the underlying facts of the case, the history and characteristics of the defendant, and the nature and seriousness of the danger to the community if Evans were released.  That pleading addresses the arguments raised in Evans's second motion, as very little new information has been presented, and, in our opinion, nothing that would support Evans's release.  Evans suggests that because he has family and friends in the community who support him and because there is a community organization

willing to offer him employment as an entry-level janitor, he should be released.[1]  We disagree

and respond briefly to Evans's renewed motion.

###    1.    Evans distributed narcotics and was not entrapped.

Evans begins his argument by stating that he is not "accused of possessing or selling

narcotics."  It is true that the sole charge in the criminal complaint is the attempted possession

with intent to distribute five kilograms or more of cocaine.  The affidavit in support of the

complaint, however, includes facts establishing that on November 13, 2025, Evans distributed

4,487 MDMA (ecstasy) pills to an undercover officer at the Potomac Yard shopping center in

Alexandria, Virginia; that he engaged in a conspiracy to manufacture and distribute controlled

substances; and that he used and carried firearms during and in relation to his drug offenses.

There is also new evidence that Evans possessed a number of different controlled substances at

his Maryland apartment.

Evans also states, "there is some indication that Evans was entrapped into the criminal

activity . . .."  There is no such "indication" anywhere in the record that Evans was "entrapped,"

nor are we aware of any such evidence.

Entrapment is an affirmative defense consisting of two related elements: (1) government

inducement to commit a crime, and (2) the lack of predisposition on the part of the defendant to

engage in criminal conduct.  *Matthews v. United States*, 485 U.S. 58 (1998). The first element,

"inducement," requires government overreach "and conduct sufficiently excessive to implant a

criminal design in the mind of an otherwise innocent party."  *United States v. Hsu*, 364 F.3d 192,

---

[1] Lead4Life is a non-profit organization offering several youth, adult, and family programs, including an adult-re-entry program for Maryland adults who are on parole or probation. Although it is commendable that the organization would offer Evans employment, it does not appear that its re-entry program is intended for persons pending trial but instead for those who have served their sentences and are transitioning back into society and the workplace.

198 (4th Cir. 2004). The second element, predisposition, refers to "the defendant's state of mind before government agents make any suggestion that he shall commit a crime." *Id*. at 198; *see also United States v. Chhipa*, 2024 WL 4682294 (E.D. Va. November 5, 2024) (Novak, J.). At trial, to be entitled to an entrapment instruction, a defendant must point to evidence of "government overreaching and conduct sufficiently excessive to implant a criminal design in the mind of an otherwise innocent party." *Hsu* at 198. And, even if a government agent had initiated a drug transaction with a defendant and solicited him to conduct a drug deal, it is well established that such evidence is not sufficient to support an entrapment defense, as inducement "requires more than mere solicitation by the government." *Hsu* at 198; *see also United States v. Ramos*, 462 F.3d 329, 334 (4th Cir. 2006); *United States v. Velasquez*, 802 F.2d 104, 106 (4th Cir. 1986).

Evans openly spoke with the primary DEA undercover source, CS-2, at their first face-to-face meeting on October 30, 2025, about Evans's desire to develop a new source of cocaine. Evans talked about the quantities he was interested in purchasing and was knowledgeable about current prices for bulk shipments of cocaine. He told CS-2 that he was supplying seven other individuals with cocaine, but he alone would be handling the receipt of cocaine from CS-2. Evans explained that he did not want anyone else to know how much cocaine and money Evans possessed. At this same meeting, Evans told CS-2 that he could supply CS-2 with fentanyl pills ("M-30s") at a price of $1 per pill, and he had a large quantity of pills on hand (Dkt. 20 at ¶¶ 21, 22). At this point in the investigation, the government had learned that Evans had acquired a commercial-grade pill press and received at his Alexandria apartment kilogram quantity shipments of the inactive ingredients used to make counterfeit pills (Dkt. 20 at ¶¶ 16, 20).

Simply put, there is no evidence that the government put a "criminal design" into the mind of an otherwise innocent man.

2.      **Evans possessed large amounts of cash with no source of legitimate income.**

Evans continues to insist that he was gainfully employed by Kapitale United (not, this time, by KNJ Solutions, Door Dash, Uber Eats, or Relay). While under investigation and subject to frequent surveillance, DEA agents saw no evidence of employment other than drug trafficking. Moreover, as discussed in our prior response, government agencies in Maryland, Virginia, Florida, and Washington, D.C. report no earnings or wages for Evans for employment with any business from 2022 to 2025. Kapitale United, his supposed employer, was registered in Florida using a fictitious address, and the address it had used in Maryland is an abandoned house. Banking records show no receipt or disbursement of funds to or from customers, clients, suppliers, vendors, or any other business entities. It appears that the company is simply a shell corporation used by Evans to transfer money through various bank accounts and for obtaining leases, insurance, and financing for his car purchases. Evans has identified himself at different times as the company CEO, owner, and "managing member." But, in 2022, Evans represented in a finance application for an expensive car that he had been a self-employed venture capitalist for 20 years with an annual income of $320,000. In 2025, he represented on another automobile finance application that he was employed as a manager for the past two years by Shaki Dobbs, a nightclub owner in Miami. But in 2023, when applying for a lease for his Alexandria apartment, Evans represented that he was employed by Kapitale United from 2013 to 2021, and by Shaki Dobbs from 2022 to 2023.

What is a fact is that Evans possessed large amounts of cash with no corresponding record of lawful employment. On November 18, 2025, Evans met with CS-2 at a TGI Fridays

restaurant.  During that meeting, Evans gave CS-2 a black bag containing $40,000 in cash (Dkt. 20 at ¶ 27).  That meeting was followed by the seizure of $214,060 in cash when Evans was arrested on January 23, 2026.  For about the past decade, Evans has made car purchases with large cash downpayments, *e.g.*, a 2022 Porsche 911 for $252,380, with a cash downpayment of $40,329.49 on June 24, 2025; a 2021 Lamborghini Urus for $336,039.37, with a cash downpayment of $135,000 on July 16, 2022; a 2020 Mercedes G63-AMG for $242,994.19, with a cash downpayment of $30,000 on September 21, 2021; a 2019 Ferrari 812 Superfast for $366,054.49, with a cash downpayment of $100,000 on January 5, 2021; a lowly 2018 Honda Odyssey for $31,914, with a cash downpayment of only $8,000 on September 30, 2020; a 2015 Porsche 911 for $165,288, with a cash downpayment of $60,000 on July 5, 2016.  This list does not include a 2019 Lamborghini, 2018 Porsche Panamera, a 2015 Jeep Wrangler, two Ford trucks, and other vehicles for which additional records are being sought, nor a 2021 Mercedes AMG purchased by Cherell Wilson in 2023 for $92,000 with a cash downpayment of $55,000.[2]

### 3.  Evans obstructed justice after his arrest.

The government had prepared an application for a search warrant of Evans's Maryland apartment prior to his arrest on January 23, 2026, but we were told by our counterparts in the District of Maryland that the duty magistrate judge would not be able to consider our application until the following week.  DEA agents then asked the building management whether they would secure the apartment until a warrant was obtained, and they agreed to install a new lock on the apartment door, which they did on January 23.  DEA agents did not obtain a search warrant until the following Wednesday, January 28.  When the agents arrived at the apartment, the lock

---

[2] The 2022 Porsche is still missing.  Although prior counsel represented that it had been sold, there is no record of the sale or a change in the car's registration or title.  Evans had about $100,000 in equity in that vehicle.

installed on the door had been changed, and, when they entered, the agents surmised that someone had tried to clean up the apartment.  In our prior response, we wrote:

> In appealing his detention order, Evans relies primarily on his local ties and "substantial" contacts within the community. But those local connections are precisely what would make his release a danger to the safety of others and the community. Someone (yet unidentified) broke into Evans's apartment and appeared to have cleaned it up shortly after Evans's arrest and, perhaps, removed important evidence.

We know that is, in fact, what happened.  When agents searched the Maryland apartment, they found a commercial grade pill press, money counter, digital scale, a kilogram press, and drug paraphernalia used to manufacture and cut controlled substances.  *See* Exhs. 6-11 submitted in anticipation of a hearing on the withdrawn motion.  Agents also found a vacuum cleaner next to the pill press plugged into a power strip.  The agents seized powder and several tablets from the vacuum cleaner (DEA Exhs. 4.01 through 4.03) and submitted the substances to the DEA Mid-Atlantic Laboratory.  The powdery substance taken from the vacuum (DEA Exh. 4.01) weighed about 228 grams and consisted primarily of MDMA along with a small amount of fentanyl.  Five tablets (DEA Exh. 4.02) contained fentanyl.  Four tablets contained caffeine.  In the washer/dryer closet, DEA found four plastic baggies containing powdered caffeine (DEA Exh. 5.01) and one tablet containing oxycodone (DEA Exh. 5.02).  Another three plastic baggies from the washer/dryer closet contained a blue powdery substance.  The baggies contained 387 grams of powder consisting of fentanyl and smaller amounts of heroin, ketamine, cocaine, procaine, BTMPS (a common adulterant for fentanyl), and caffeine (DEA Exh. 6.01).  Agents also found three baggies in the same area containing a brown substance, which contained heroin and procaine (DEA Exh. 7.01).  DEA Exh. 8 was found in a kitchen cabinet; it contained acetaminophen, a common cutting agent when making counterfeit pills.  Agents seized another baggie in the washer/dryer closet (DEA Exh. 9).  That baggie contained 16 grams of fentanyl

6

along with carfentanil and xylazine.  Finally, agents found another plastic baggie in the washer/dryer closet (DEA Exh. 10) with 29 tablets containing fentanyl, procaine, and BTMPS (DEA Exhs. 10.01-10.03.).

Following his arrest on January 23, 2026, Evans was detained at the Alexandria jail. During the first of several recorded calls from jail the night he was arrested, Evans talked over the phone about his "kids" having to go into both "places."  The following day, Evans talked to Ms. Wilson by phone while she was standing outside the door of Evans's Maryland apartment. She told Evans that the lock had been changed.  In a subsequent call to an unidentified female about 12 hours later, Evans told the female that Evans's nephews will be able to do what he needs, that they are working on it, and that they will get it taken care of.  Evans also talked by phone to one of his sons about checking Evans's Alexandria apartment, which the son did, and they discussed what the son had found.  Evans gave his son instructions on what to do with certain items the son retrieved from the apartment.

It is understandable that Evans's family members and friends are supporting him and would like to see him released on bond.  But these are some of the same family members and friends who did Evans's bidding and helped him obstruct justice and destroy evidence.  While some feign surprise that Evans was arrested, they knew – or should have known – that Evans was trafficking in drugs, as he did not hide his extravagant lifestyle, expensive cars, large amounts of cash, jewelry, and lack of legitimate employment.[3]

Pretrial release on bond ultimately is a matter of trust.  Evans has not demonstrated that he deserves that trust, and he should not be released.

---

[3] Evans's iCloud account contains dozens of photographs and videos of Evans wearing what appears to be expensive jewelry and watches, of Evans at clubs and parties and with expensive cars.  There are even photographs of his then juvenile sons holding large amounts of cash.

## Conclusion

For these reasons, based on the evidence received at the prior hearing, the additional evidence proffered in the government's first response, and the additional evidence proffered in this second response, we respectfully ask this Court to deny the defendant's motion to revoke the Magistrate Judge's Detention Order.

Respectfully submitted,

_____/s/_____
James L. Trump
Assistant United States Attorney

**CERTIFICATE OF SERVICE**

I hereby certify that on March 11, 2026, I caused the foregoing pleading to be sent electronically to counsel of record through the Court's ECF system.

_____/s/_____

James L. Trump
Assistant United States Attorney
